UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GERALD COX, et al.,                 )
                                    )
            Plaintiffs,             )
                                    )
        v.                          )        No. 4:09 CV 852 DDN
                                    )
CITY OF MARYLAND HEIGHTS, et al.,   )
                                    )
            Defendants.             )

## MEMORANDUM

This action is before the court on the motions of defendants the
City of Maryland Heights, Tom O'Connor, Joe Delia, and Sean Fanning to
strike the affidavit of plaintiff James Cox (Doc. 52) and for summary
judgment (Doc. 32).  The parties have consented to the exercise of
plenary authority by the undersigned United States Magistrate Judge
pursuant to 28 U.S.C. § 636(c).  (Doc. 11.)  Oral arguments were heard
on May 25, 2011.

## I.  BACKGROUND

On June 3, 2009, plaintiffs Gerald Cox, James Cox, and Cox, Inc.,
d/b/a Cox Bail Bonds, commenced this action against the City of Maryland
Heights; Tom O'Connor, Chief of Police of the City of Maryland Heights;
Joe Delia, Lieutenant of the City of Maryland Heights Police Department;
and Sean Fanning, Police Officer of the City of Maryland Heights, in
their individual and official capacities, for damages arising out of the
arrest of Gerald and James Cox and revocation of Cox, Inc.'s business
license.  (Doc. 1.)  Following the commencement of this action, Gerald
Cox passed away.  (Doc. 37-14.)  Thereafter, all claims brought by him
were voluntarily dismissed with prejudice.  (Docs. 41, 58.)

Plaintiffs James Cox and Cox Bail Bonds raise 12 counts of claims
for relief in their complaint.  (Doc. 1.)  In Counts I, III, IV, V, and
VII, plaintiffs bring claims under 42 U.S.C. § 1983 against defendants,
alleging defamation; unreasonable search and seizure; false imprisonment;

malicious prosecution; and conspiracy to violate their civil rights. (<u>Id.</u> at ¶¶ 38-44, 51-69, 78-81.)

In Counts II, VI, VIII, IX, X, XI, and XII, plaintiffs allege state law claims of slander; malicious prosecution; civil conspiracy; tortious interference with a business expectancy; tortious interference with contract; replevin; and conversion. (<u>Id.</u> at ¶¶ 45-50, 70-77, 82-86, 87-93, 94-100, 101-08, 109-16.)

## II.  MOTION TO STRIKE THE AFFIDAVIT OF JAMES COX

Defendants move to strike the affidavit of plaintiff James Cox from consideration of defendants' motion for summary judgment.  Defendants argue that the affidavit is not based on personal knowledge, contains inadmissible hearsay, conflicts with James Cox's prior deposition testimony, and contains irrelevant statements.  (Docs. 52, 53.) Plaintiffs respond that the affidavit is based on personal knowledge, is consistent with James Cox's deposition testimony, contains information relevant to the foundation for plaintiffs' claims, and contains admissible statements.  (Doc. 55.)

An affidavit used to contest a motion for summary judgment must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  The court should disregard those portions of an affidavit that fail to comply with the requirements of Rule 56(c)(4).  <u>Howard v. Columbia Pub. Sch. Dist.</u>, 363 F.3d 797, 801 (8th Cir. 2004); Fed. R. Civ. P. 56(e).  Nor should the court consider those portions of an affidavit that conflict with the affiant's prior deposition testimony, unless the conflict is a product of prior confusion.  <u>City of St. Joseph v. Sw. Bell Tel.</u>, 439 F.3d 468, 476 (8th Cir. 2006).  The court must exercise "extreme care" when evaluating whether a potential conflict exists and whether the conflict requires exclusion of the conflicting affidavit.  <u>Id.</u>

In his affidavit, James Cox speaks to his prior working relationship with Lt. Delia, his employment with Cox, Inc., his dealings with Leah Pinion and Lance Peabody, and the police investigation thereof.  He also discusses the criminal charges brought against him, the revocation of

Cox, Inc's ability to issue bail bonds, the local media's coverage of his arrest, and the dismissal of his criminal charges. (Doc. 44-1, Cox Aff. at ¶¶ 1-38.) To the extent the affidavit speaks to factual occurrences to which James Cox was personally present, such information complies with Rule 56(c)(4). These statements are not contrary to the Federal Rules of Evidence, and do not materially conflict with James Cox's prior deposition testimony.[1]

That said, certain portions of James Cox's affidavit run afoul of Rule 54(c)(4)'s requirements and must be stricken. Specifically, James Cox's testimony regarding Lt. Delia's knowledge of James Cox's criticisms against him is a product of speculation rather than personal knowledge. (Doc. 44-1, Cox. Aff. at ¶ 3.) Similarly, those sections of the affidavit speaking to why the City of Maryland Heights Police Department contacted James Cox's ex-wife upon his arrest are speculative and based on personal belief rather than personal knowledge. (Id. at ¶¶ 25, 26.) To the extent James Cox testifies to Morris Davis's criminal history and conditions of probation, such information must be excluded for lack of personal knowledge and relevance. (Id. at ¶¶ 6, 7.) See El Deeb v. Univ. of Minn., 60 F.3d 423, 428 (8th Cir. 1995) ("Affidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge."). Those sections of the affidavit interpreting the legal effect of the ruling by the Circuit Court for the

---

[1]Defendants identify certain "conflicts" between James Cox's prior deposition testimony and statements made in his affidavit. With one notable exception, these inconsistencies are not contradictory. Rather, in some instances, James Cox provided greater detail in his affidavit than his deposition testimony. "[W]hen the affiant's affidavit does not actually contradict his earlier testimony, the district court should not strike the affidavit from the record." City of St. Joseph v. Sw. Bell Tel., 439 F.3d 468, 476 (8th Cir. 2006). Therefore, the affidavit need not be rejected on this ground.

The affidavit and prior deposition testimony do materially conflict, however, regarding the expenses incurred by Lance Peabody, for which Arlene Taylor paid. In his prior deposition testimony and statement to the police, James Cox identified the expenses as "$5,050.00," compared to "$5,500.00" in his affidavit. The itemized expenses contained therein similarly conflict. Given the detailed nature of the testimony, these inconsistencies may have been a result of prior confusion. As such, they would be more properly resolved by a trier of fact. Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1030-31 (8th Cir. 2000).

City of St. Louis must also be stricken as improper legal opinions. (Doc. 44-1, James Cox Aff. at ¶ 30.)  <u>See</u> <u>Herd v. Am. Sec. Ins. Co.</u>, 556 F. Supp. 2d 992, 996 (W.D. Mo. 2008).  Those sections of the affidavit speaking to the release of arrest photographs by the City of Maryland Heights and the veracity of Chief O'Connor's statements to the news media are also based on speculation and personal belief rather than personal knowledge.  (Doc. 44-1, James Cox. Aff. at ¶¶ 34, 35.)  With the exception of James Cox's testimony that he has not been notified of any investigation, those sections of the affidavit regarding the status of any ongoing investigations by the United States Attorney's Office and the veracity of Lt. Delia's statements thereof are also a product of personal belief and speculation.  (<u>Id.</u> at ¶ 38.)

Therefore, James Cox's affidavit will be considered to the extent it complies with Fed. R. Civ. P. 56(c)(4) and is not otherwise inadmissible, as set forth above.

### III.  MOTION FOR SUMMARY JUDGMENT

Defendants argue that they are entitled to summary judgment because no causal link exists between their criminal investigation and the suspension of Cox, Inc.'s license to issue bail bonds, and because Cox, Inc's license to issue bail bonds is not constitutionally protected. Defendants also argue that only Chief O'Connor made statements to the media, and that his statements were either truthful or personal opinions. Defendants further argue that probable cause existed to arrest Gerald and James Cox based on the $5,500.00 sought from Peabody and given by his mother, and that St. Louis County Prosecuting Attorney Jack Duepner evaluated the evidence and independently determined to file criminal charges.  Defendants also generally argue they are shielded by qualified immunity, official immunity, and sovereign immunity.[2]  (Doc. 35.)

---

[2]To the extent defendants raise qualified immunity as a blanket defense, without tailoring their argument to specific facts, claims, or parties, this defense fails.  <u>See</u> <u>Johnson v. Boyd</u>, 676 F. Supp. 2d 800, 812-13 (E.D. Ark. 2009) (blanket qualified immunity defense failed) (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001) (qualified immunity is not "a broad general proposition")).  <u>See also</u> <u>Winston v. Simmons</u>, No.
(continued...)

Plaintiffs respond that under Missouri law, Cox, Inc. has a property interest in its license to issue bail bonds, and that property interest was revoked under color of state law. Plaintiffs also respond that Chief O'Connor's statements to the news media were false, that no probable cause existed to arrest, and that defendants knowingly instigated an unwarranted criminal prosecution to cause them financial harm. Plaintiffs further respond that they cannot respond to defendants' assertions of qualified immunity, official immunity, and sovereign immunity defenses because defendants have not tailored these defenses to specific claims, facts, and parties. (Doc. 43.)

Defendants reply that the ability to write bail bonds in Missouri is not constitutionally protected, and that they did not cause the revocation of Cox, Inc.'s license. Defendants also reply that comments made by Chief O'Connor were believed to be true and did not damage plaintiffs. Defendants further reply that probable cause existed to arrest James Cox on September 18, 2008 and November 26, 2008, and that there was no conspiracy to arrest plaintiffs or to interfere with their business. (Doc. 54.)

## IV.  STATEMENT OF UNDISPUTED FACTS

On June 6, 2008, Leah Pinion entered into an agreement with Cox Bail Bonds, in which she agreed to pay $3,000.00 in consideration for Cox Bail Bonds posting a bail bond on her behalf.[3] (Doc. 44 at ¶ 13; Doc. 33-5.) Pinion's then-boyfriend, Lance Peabody, co-signed the agreement, paid Cox Bail Bonds $1,500.00, and executed a quitclaim deed on his residence to Cox Bail Bonds on behalf of Pinion. (Doc. 44 at ¶¶ 14, 15; Doc. 33-5.)

In August of 2008, Peabody informed plaintiffs that he no longer wanted to support Pinion's bond, and agreed to cooperate in bringing in

---

[2](...continued)
Civ.A. 01-3335-KHV, 2003 WL 21418359, at *6 n.5 (D. Kan. June 18, 2003) (denying summary judgment where the defendants failed to "explain the basis fo their qualified immunity argument with respect to the specific facts involving each claim against each defendant").

[3]The $3,000.00 represented 10 percent of Pinion's $30,000.00 bond. (Doc. 53 at ¶ 164.)

Pinion. (Doc. 44 at ¶ 16.) Peabody told James Cox the access code to his garage and where to find a key to his home, where Pinion was staying. (Id. at ¶ 17.) On August 11, 2008, James Cox, Kevin Grillion, and Tammy Smith, who were all agents or employees of Cox Bail Bonds, went to Peabody's home to seize Pinion.[4] (Id. at ¶ 18.) Pinion was apprehended, but escaped from Cox Bail Bonds agents' custody while being transported to the St. Louis City Justice Center. (Id. at ¶ 22; Doc. 37-21.)

On August 15, 2008, Pinion called Peabody and told him that she had arranged to turn herself in to James Cox the next day, but wanted to spend the night with Peabody at a Motel 6. (Doc. 44 at ¶ 24.) Peabody and Morris Davis, an agent of Cox Bail Bonds, waited for Pinion at the agreed upon Motel 6 in order to apprehend her. (Id. at ¶ 25.) Pinion, however, became suspicious that she was being set-up, and never went to the Motel 6. (Id. at ¶ 26.) Instead, she called Peabody and told him to pick her up in Fairview Heights, Illinois. (Id. at ¶ 27.) Peabody and Davis drove separately to Fairview Heights. (Id. at ¶ 28.) Davis tried to follow Peabody, but got separated in traffic. (Id.) Peabody picked up Pinion alone in Fairview Heights. (Doc. 44 at ¶ 29.) Although she remained suspicious, Pinion directed Peabody to drive to a La Quinta Inn in Maryland Heights. (Id.) Peabody did so, and made a one-night reservation for himself and Pinion at the La Quinta Inn. (Id. at ¶ 30.) Pinion later extended the reservation two additional days under the name "Amy Lamacchia." (Id. at ¶ 31.) Peabody stayed in the hotel room with Pinion periodically on Friday, August 15 and Saturday, August 16, 2008. (Id. at ¶ 32.)

On the night of August 16, 2008, James Cox called Peabody and told him that Pinion had not yet surrendered. (Doc. 44 at ¶ 33.) Peabody returned to the hotel room, and he and Pinion ate dinner and went to sleep. (Id. at ¶ 34.)

---

[4]James Cox could not be involved in any physical arrests because he pleaded guilty to a felony in 2004 for conspiracy to violate civil rights. (Doc. 44 at ¶ 21.) The parties dispute the degree of his involvement in the August 11, 2008 capture of Pinion. (Id. at ¶¶ 18, 20.) This factual determination is immaterial to the present action.

<u>August 17, 2008 Capture at the La Quinta Inn</u>

At 1:30 a.m. on August 17, 2008, Peabody and Pinion were awakened by a loud crashing noise in their hotel room. (<u>Id.</u> at ¶ 35.) The crashing noise was caused by Davis forcibly breaking down their hotel room door. (<u>Id.</u> at ¶ 36.) Peabody saw four people enter the hotel room wearing badges on chains around their necks and armed with handguns. (<u>Id.</u> at ¶ 37.) These four men were later identified as Cox Bail Bonds employees or agents Morris Davis, Grillion, Erik Nolan, and Dennis Weatherford. (Doc. 44 at ¶ 38.) Davis forced Pinion to the ground, handcuffed her, and told her she was going to jail. (<u>Id.</u> at ¶ 39.) Weatherford handcuffed Peabody while another Cox Bail Bonds agent pointed a taser at him and told him he was going to jail for aiding and abetting a fugitive. (<u>Id.</u> at ¶¶ 40, 42; Doc. 37-24.) Pinion told that agent not to take Peabody because he had done nothing wrong, but the agent threatened to stun her with a taser if she did not stop talking. (Doc. 44 at ¶ 41.) The four men took Pinion and Peabody from the room, with their hands cuffed behind their backs, and walked to the parking lot. (<u>Id.</u> at ¶ 43.) Davis, who was on the phone once they reached the parking lot, told the agents that both Pinion and Peabody were to be taken to the Cox Bail Bonds office in St. Charles, Missouri. (<u>Id.</u> at ¶ 44.) One of the Cox Bail Bonds agents took Peabody's car keys, sat Peabody in the front seat of Peabody's car, and drove Peabody's car to the Cox Bail Bonds office without Peabody's permission. (<u>Id.</u> at ¶¶ 47, 48.) While still handcuffed, Pinion was placed in Davis's car and driven to the Cox Bail Bonds office. (<u>Id.</u> at ¶ 49.)

<u>August 17, 2008 Events at the Cox Bail Bonds Office</u>

Upon their arrival at the Cox Bail Bonds office, Peabody and Pinion were taken to Gerald Cox's office. (Doc. 44 at ¶ 51.) They were still handcuffed. (<u>Id.</u>) While in his office, Gerald Cox scolded Pinion and Peabody for their actions. (<u>Id.</u> at ¶ 52.) He then had Davis remove Peabody's handcuffs and take Pinion outside the room. (<u>Id.</u> at ¶ 53.) Once they were alone, Gerald Cox picked up a small handgun from the top of his desk, showed it to Peabody, and put it in his desk drawer, while

saying, "Yea, nobody has ever ran away from me and got away."[5]  (Doc. 44 at ¶ 54; Doc. 37-15, Peabody Dep. at 32:12-19.)  Peabody became frightened, felt trapped, and feared for his safety.  (Doc. 44 at ¶ 55; Doc. 37-15, Peabody Dep. at 32:20-33:1, 16-20.)  Gerald Cox told Peabody that he owed a balance of $5,500.00 from Pinion's bond and related fees.[6] (Doc. 44 at ¶ 59; Doc. 37-15, Peabody Dep. at 33:2-13.)  Gerald Cox said that a prosecutor had told him to arrest Peabody for aiding and abetting a fugitive, and that if Peabody did not pay the $5,500.00 balance, he could go to jail and Cox Bail Bonds could take his home and money.  (Doc. 44 at ¶ 56; Doc. 37-15, Peabody Dep. at 30:16-31:1, 58:20-59:4.)

### August 22, 2008 Balance Payment

On August 22, 2008, Peabody's mother, Arleen Taylor, went to the Cox Bail Bonds office and gave Gerald Cox a cashiers' check for $5,500.00, money she had received from insurance after her stepson's death, on behalf of Peabody.  (Doc. 44 at ¶ 60.)  Gerald Cox gave her a receipt reflecting that all bond fees had been paid and that Peabody's deed had been returned.[7]  (Id. at ¶ 62.)  Days later, James Cox gave Davis

---

[5]Plaintiffs dispute this fact and others on the basis that the statements "contain[] hearsay statements of decedent, Gerald Cox, Sr., and [are] inadmissible." (Doc. 44 at ¶¶ 54-58.)  While these objections, if valid, would be sufficient to contest these facts, see Walker v. Wayne Cnty., Iowa, 850 F.2d 433, 435 (8th Cir. 1998), these statements are not hearsay because they are not offered "to prove the truth of the matter asserted," i.e. that no one had ever safely run from Gerald Cox before. Fed. R. Evid. 801(c).  To the extent defendants dispute facts solely by arguing that they are irrelevant or immaterial, these objections are also insufficient to contest facts.  See Portis v. City of Chicago, 510 F. Supp. 2d 461, 464-65 (N.D. Ill. 2007); Menasha Corp. v. News Am. Marketing In-Store, Inc., 238 F. Supp. 2d 1024, 1029 (N.D. Ill. 2003).

[6]The parties dispute whether this $5,500.00 balance included the remaining $1,500.00 of the original $3,000.00, or was in addition to the remaining $1,500.00.  (Doc. 44 at ¶ 59.)

[7]The parties dispute whether Gerald Cox gave Arlene Taylor an itemized receipt.  (Doc. 44 at ¶¶ 63, 64.)  Compare (Doc. 44-1, James Cox Aff. at ¶ 16; Doc. 44-6) with (Doc. 33-7, Zambruski Aff. at ¶ 27; Doc. 37-16 at 14.)

$1,000.00 in cash, to be divided among the bounty hunters who had captured Peabody and Pinion. (Id. at ¶ 69.)

## Police Investigation

On August 19, 2008, Officer David Zambruski learned that Peabody and Pinion were forcibly taken from the La Quinta Inn. (Id. at ¶ 73.) The La Quinta Inn front desk manager, Kembra Courtland, told Officer Zambruski that the FBI had surrounded the hotel and forced entry into room number 150 to capture a wanted fugitive. (Id. at ¶ 74.) However, Officer Zambruski found no official calls made for police service at that date, time, and place. (Doc. 44 at ¶ 75.) Officer Zambruski examined hotel security footage from the night of August 17, 2008, and contacted and interviewed the La Quinta Inn night clerk, Trsvetanka Kracholova, who witnessed the seizure of Peabody and Pinion. (Id. at ¶¶ 76, 77.)

On August 25, 2008, Officer Zambruski and Det. Sean Fanning contacted and interviewed Peabody. (Doc. 44 at ¶¶ 79-81; Doc. 33-7, Zambruski Aff. at ¶ 13.) Peabody provided a written statement describing the events of the night of August 17, 2008 and identified Grillion, Davis, and Weatherford in photographic line-ups as three individuals who were present when he was taken against his will from the hotel room. (Doc. 44 at ¶¶ 79-81.)

On August 26, 2008, Officer Zambruski and Lt. Joe Delia conducted a follow-up interview with Peabody. (Id. at ¶¶ 82-84; Doc. 37-16 at 9.) Peabody voluntarily came to the Maryland Heights Police Station to answer additional questions. (Doc. 37-16 at 9.) Peabody confirmed that his mother had paid Gerald Cox $5,500.00 on his behalf. (Id.)

That afternoon, Officer Zambruski and Detective Fanning interviewed Pinion regarding her interactions with Cox Bail Bonds. (Doc. 44 at ¶ 85.) Pinion identified Grillion as one of the bounty hunters who entered her hotel room. (Id. at ¶ 86.) Pinion also provided a written statement. (Id.; Doc. 37-21.)

During the course of the investigation, Det. Fanning obtained and analyzed a list of bail recovery agents licensed in Missouri, and determined that Davis and James Cox were not licensed bail recovery agents. (Doc. 44 at ¶¶ 87, 88.) Det. Fanning also prepared and served

a grand jury subpoena for the $5,500.00 cashiers' check issued by Regions Bank. (<u>Id.</u> at ¶ 89.) Regions Bank provided a copy of the front and back of the cashiers' check, which revealed a routing number from a Commerce Bank. (<u>Id.</u> at ¶¶ 90, 91.) Det. Fanning then prepared and served a grand jury subpoena on Commerce Bank for all records pertaining to Gerald Cox and his businesses, after which he discovered the cashiers' check was deposited into a bank account registered to Gerald Cox Brokerage and Auto Sales, Inc. or Jerry Cox d/b/a Quick Release Bail Bonds, and that one signature card for the account listed Gerald, James, and Jeanette Cox as persons authorized to make deposits and withdraws from the account. (<u>Id.</u> at ¶¶ 92-94.)

Det. Fanning and Lt. Delia also investigated the possible kidnapping of Peabody. (<u>Id.</u> at ¶ 95.) As part of the investigation, officers from the Maryland Heights Police Department obtained, reviewed, and analyzed surveillance videotapes from the La Quinta Inn; the bond contract between Cox Bail Bonds and Pinion and Peabody; the cashiers' check given by Arlene Taylor to Gerald Cox; photographs of James Cox cashing the cashiers' check at Commerce Bank; Pinion's criminal charges; James Cox's cellular telephone records; a listing of licensed bail bondsmen; a copy of the quitclaim deed executed by Peabody to Cox Bail Bonds; and eleven firearms related to the investigation. (<u>Id.</u> at ¶ 96.)

### September 18, 2008 Search and Arrests

As part of the investigations, St. Louis County Assistant Prosecutor and Chief Warrant Officer Jack Duepner met with Lt. Delia and Det. Fanning, discussed the investigation, and assisted in preparing an application for a search warrant and in drafting a search warrant for the Cox Bail Bonds office. (<u>Id.</u> at ¶¶ 97, 117-21, 123-26; Doc. 37-1.) On September 16, 2008, St. Charles County Circuit Court Judge Terry Cundiff issued the search warrant for the Cox Bail Bonds office. (Doc. 44 at ¶ 98; Doc. 37-1.)

On September 18, 2008, Maryland Heights police officers executed the search warrant at the Cox Bail Bonds office. (Doc. 44 ¶¶ at 99, 100.) During the execution of the search warrant, officers found a loaded pistol in the upper right hand drawer of Gerald Cox's desk. (<u>Id.</u> at

¶¶ 99, 100.)  Lt. Delia was in contact with Duepner during the search regarding the progress of the search and any arrests.  (_Id._ at ¶¶ 102, 104.)  At some point that day, James Cox was arrested.  (_Id._ at ¶ 101; Doc. 33-3, Delia Aff. at ¶ 10.)

<u>November 26, 2008 Arrests</u>

On October 30, 2008, Duepner met with Lt. Delia and Det. Fanning to consider whether charges would be issued against any suspects in the investigation.  (Doc. 44 at ¶ 128.)  Duepner had the final decision as to which charge(s), if any, would be brought against James and Gerald Cox based on the evidence.  (_Id._ at ¶ 133.)  Duepner approved that criminal charges be issued by the St. Louis County Prosecuting Attorney on behalf of the State of Missouri against James and Gerald Cox.  (_Id._ at ¶ 132.)

Duepner also helped prepare probable cause statements, dated November 24, 2008, on behalf of Det. Fanning, for applications for arrest warrants for Gerald Cox, James Cox, Morris Davis, Kevin Grillion, Erik Nolan, and Dennis Weatherford.  (_Id._ at ¶ 131; Docs. 37-8, 37-9, 37-10, 37-11, 37-12, 37-13.)

On November 26, 2008, Lt. Delia and Det. Fanning, with the St. Louis County Prosecutor's Office, applied to and received arrest warrants for Gerald Cox, James Cox, Morris Davis, Kevin Grillion, Erik Nolan, and Dennis Weatherford.  (Doc. 44 at ¶ 105.)  Gerald Cox, Kevin Grillion, Erik Nolan, and Dennis Weatherford were charged with: (a) burglary in the first degree; (b) kidnapping; (c) tampering with a motor vehicle; (d) stealing $500 or more; and (e) failing to inform law enforcement of an apprehension.  (Docs. 37-2, 37-5, 37-6, 37-7.)  James Cox and Morris Davis were charged with: (a) burglary in the first degree; (b) kidnapping; (c) tampering with a motor vehicle; (d) stealing $500 or more; and (e) unlawful conduct as a surety recovery agent.  (Docs. 37-3, 37-4.)

<u>Statements to the Media</u>

Following the arrests, Chief O'Connor spoke on local television regarding James and Gerald Cox's involvement in the seizure of Peabody.  (Doc. 44 at ¶ 108.)  Neither Lt. Delia nor Det. Fanning made any comments

to the media regarding the arrest of James and Gerald Cox or their involvement in the seizure of Peabody. (Id. at ¶¶ 106, 107.)

### License Revocation

On November 26, 2008, Circuit Clerk Mariano Favazza revoked the license of Gerald Cox to serve as a bail bond or surety agent in the City of St. Louis. (Doc. 44-11.) This revocation also precluded Cox Bail Bonds from such activities. (Id.) Favazza also filed a motion to show cause, in which he requested that Gerald Cox appear at a hearing on December 4, 2008 to determine whether he should be disqualified from acting as a bail bond or surety agent. (Doc. 44-12.) Following the license revocation by Favazza, Gerald Cox and Cox Bail Bonds' permits to write bail bonds in St. Louis County and municipalities in the St. Louis area were also revoked. (Doc. 44-13.)

On October 15, 2009, the Circuit Court of the City of St. Louis, Missouri found the revocation by Favazza improper. (Doc. 44-14.)

### Dismissal of Charges

In December, 2008, before the case was presented to a grand jury, Andrew Gentry Smith, an Assistant Prosecuting Attorney in the Office of the St. Louis County Prosecuting Attorney, reviewed the charges raised against James Cox, Gerald Cox, Morris Davis, Kevin Grillion, Erik Nolan, and Dennis Weatherford. (Doc. 44 at ¶¶ 137-41.) In April, 2009, prior to presenting the case to a grand jury, Smith met with Davis, in the presence of his counsel, to discuss Davis's audiotape statement given to the Maryland Heights Police Department on September 18, 2008. (Id. at ¶ 143.) During the meeting, Davis told Smith that he personally made the decision to transport Peabody and Pinion from the hotel room to the Cox Bail Bonds office, and that neither James Cox nor Gerald Cox directed him to do so. (Id. at ¶ 144.) In his September 18, 2008 taped statement to Officer Zambruski, Davis had said that he took a photograph of Pinion and Peabody after they were apprehended at the hotel and sent the photograph to James Cox on the night of the seizure. (Id. at ¶ 145.) However, search results following the seizure of Davis's cellular phone revealed no photographs of Peabody or Pinion. (Id. at ¶¶ 146, 147.) Smith told

his supervisors that he believed the criminal charges should be dismissed, and his supervisors agreed. (<u>Id.</u> at ¶¶ 151, 152.)

In exchange for dismissing the charges against Gerald Cox, Cox Bail Bonds agreed to return to Taylor the $5,500.00 that had been collected in connection with Pinion's bond. (Doc. 44 at ¶ 154.)

<u>History Between James Cox and Lt. Delia</u>

Before 2004, James Cox worked as a detective for the City of St. Louis. (Doc. 53 at ¶ 157.) In that capacity, he was assigned to the major case squad. (<u>Id.</u>) During that time, Lt. Delia was also assigned to the major case squad, and was assigned to work with James Cox. (Doc. 53 at ¶¶ 157, 158.) James Cox made clear to Lt. Delia that he doubted Lt. Delia's investigative skills, and did not believe Lt. Delia should be assigned to the major case squad. (Doc. 53 at ¶ 158.) Lt. Delia was aware of those criticisms. (<u>Id.</u>)

## V.  MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the nonmoving party. <u>Rademacher v. HBE Corp.</u>, 645 F.3d 1005, 1010 (8th Cir. 2011). The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences. <u>Scott v. Harris</u>, 550 U.S. 372, 379 (2007).

Initially, the moving party must demonstrate the absence of an issue for trial. <u>Celotex</u>, 477 U.S. at 323. Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings or in general denials of the movant's assertions, but must instead proffer admissible evidence that demonstrates a genuine issue of material fact. Fed. R. Civ. P. 56(e); <u>Conseco Life Ins. Co. v. Williams</u>,

620 F.3d 902, 910 (8th Cir. 2010); <u>Howard v. Columbia Pub. Sch. Dist.</u>, 363 F.3d 797, 800-01 (8th Cir. 2004).

**VI.  DISCUSSION**

The court has distinguished between plaintiffs' claims that are based on federal law (Counts I, III, IV, V, and VII) and those based on state law (Counts II, VI, VIII, IX, X, XI, and XII).

**A.  Claims Arising Under Federal Law: § 1983**

§ 1983 of Title 42, United States Code, creates a cause of action for federal civil rights violations.  <u>Crumpley-Patterson v. Trinity Lutheran Hosp.</u>, 388 F.3d 588, 590 (8th Cir. 2004).  To succeed on a § 1983 claim, a plaintiff must establish (1) the violation of a right secured by the Constitution and the laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law.  42 U.S.C. § 1983; <u>Cook v. City of Bella Villa</u>, 582 F.3d 840, 848-49 (8th Cir. 2009).

Plaintiffs bring their claims against defendants in their official and individual capacities.  (Doc. 1 at ¶¶ 8-10.)

**1.  The City of Richmond Heights**

Plaintiffs allege claims under § 1983 against the City of Maryland Heights arising out of their September 18, 2008 arrest and the November 25, 2008 commencement of criminal proceedings against them.

"A municipality can only be liable for a § 1983 violation if the execution of the municipality's official policy or custom inflicts a constitutional injury." <u>Green v. Mo.</u>, 734 F. Supp. 2d 814, 853 (E.D. Mo. 2010) (citing <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978)).

Plaintiffs do not contend that any of the allegedly wrongful acts were pursuant to an official policy or custom of the City of Maryland Heights. A § 1983 claim brought against a municipality cannot survive the failure to include such allegations or arguments. <u>Chambers v. St. Louis Cnty.</u>, 247 Fed. App'x 846, 848 (8th Cir. 2007) (per curiam); <u>Crumpley-Patterson</u>, 388 F.3d at 591; <u>see also</u> <u>Green</u>, 734 F. Supp. 2d at 854

(granting summary judgment to the municipality because the plaintiff "presented no evidence of a city custom or policy to deprive individuals of their constitutional rights"); Warren v. City of Wentzville, No. 4:09 CV 1330 JCH, 2010 WL 3362721, at *6 (E.D. Mo. Aug. 25, 2010) (same).

Therefore, the City of Maryland Heights is entitled to summary judgment as to plaintiffs' § 1983 claims against it.

## 2. Individual Capacity Claims Against Chief O'Connor

Plaintiffs raise each of their § 1983 claims against all defendants, including Chief O'Connor. (Doc. 1 at ¶¶ 38-44, 53-69, 78-81.) Plaintiffs make no allegations or arguments, and proffer no evidence concerning the actions of Chief O'Connor himself, regarding their September 18, 2008 arrest and the November 25, 2008 commencement of criminal proceedings against them.[8] Thus, plaintiffs' claims are an attempt to impose liability vicariously upon Chief O'Connor.

"[G]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1948 (2009). Rather, to impose individual liability upon a supervising official, the plaintiff must allege that the supervising official "directly participated in the constitutional violation," or that the supervising official's "failure to train or supervise the offending actor caused the deprivation." Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010); see also Sastry v. City of Crestwood, No. 4:10 CV 2155 SNLJ, 2011 WL 2938163, at *4 (E.D. Mo. July 19, 2011) ("Supervisory personnel cannot be held liable under 1983 absent 'a showing of direct responsibility for the improper action' or 'personal involvement of the officer being sued.'") (quoting Harris v. Pirch, 677 F.2d 681, 685 (8th Cir. 1982)).

Plaintiffs' § 1983 claims against Chief O'Connor arise out of their arrests, criminal charges, and license revocation. Plaintiffs do not allege or argue that Chief O'Connor was involved in these actions. Rather, plaintiff's § 1983 claims against Chief O'Connor are based on his

---

[8]The only personal actions alleged by plaintiffs relate to Chief O'Connor's alleged statements to the media. See (Doc. 1 at ¶¶ 45-50.)

supervisory role over Lt. Delia and Det. Fanning, and not on his personal acts or omissions. Such claims are not cognizable under § 1983.

Therefore, Chief O'Connor is entitled to summary judgment as to plaintiffs' § 1983 claims against him in his individual capacity.

### 3. Official Capacity Claims Against Chief O'Connor, Lt. Delia, and Det. Fanning

"A suit against a government official in his or her official capacity is 'another way of pleading an action against an entity of which an officer is an agent.'" Baker v. Chisom, 501 F.3d 920, 925 (8th Cir. 2007) (quoting Monell, 436 U.S. at 690 n. 55). Thus, to sustain their official-capacity claims, plaintiffs must identify an unconstitutional policy or custom of the City of Maryland Heights. Kentucky v. Graham, 473 U.S. 159, 166 (1985); Elder-Keep v. Aksamit, 460 F.3d 979, 986 (8th Cir. 2006). Summary judgment is appropriate for the official when the plaintiff fails to identify such a policy or custom. See, e.g., Gilliam v. Southard, No. 4:10 CV 1484 TCM, 2011 WL 2443761, at *6 (E.D. Mo. June 15, 2011); Crawford v. Van Buren Cnty., No. 4:09CV00932 SWW, 2011 WL 1464513, at *3 (E.D. Ark. Apr. 15, 2011).

As discussed above, plaintiffs have not identified an unconstitutional policy or custom of the City of Maryland Heights. Therefore, defendants are entitled to summary judgment as to plaintiffs' § 1983 claims against them in their official capacities.

The court turns to plaintiffs' § 1983 claims against defendants Delia and Fanning in their individual capacities.

### 4. Count I: Defamation

In Count I, Cox Bail Bonds alleges defendants pursued criminal charges against Gerald and James Cox, despite knowing that the allegations against them were false. Cox Bail Bonds alleges defendants pursued the charges to injure its reputation, and caused the circuit courts of St. Louis City, St. Louis County, St. Charles County, and the municipalities therein to revoke its licenses to issue bail bonds.

Defamation is generally not actionable under § 1983. Loftin v. United States, 72 F.3d 133, 1995 WL 739859, at *2 (8th Cir. Dec. 15,

1995) (per curiam); <u>Underwood v. Pritchard</u>, 638 F.2d 60, 62 (8th Cir. 1981).  In order to state a § 1983 defamation claim, a plaintiff must prove "stigma plus."[9] <u>Zutz v. Nelson</u>, 601 F.3d 842, 849 (8th Cir. 2010); <u>see</u> <u>Paul v. Davis</u>, 424 U.S. 693, 701-02, 710-11 (1976).  That is, a plaintiff must establish "(1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." <u>Vega v. Lantz</u>, 596 F.3d 77, 81 (2d Cir. 2010) (citations omitted); <u>accord</u> <u>Rehberg v. Paulk</u>, 611 F.3d 828, 851-52 (11th Cir. 2010).

### i.  Damage to Reputation

In their complaint, plaintiffs allege that they "suffered damage to reputation, standing in the community, [and] humiliation." (Doc. 1 at ¶ 44.)  "Damage to reputation alone . . . is not sufficient to invoke the procedural protections of the due process clause." <u>Gunderson v. Hvass</u>, 339 F.3d 639, 644 (8th Cir. 2003).

Therefore, to the extent plaintiffs allege damage to their reputation in Count I, summary judgment is appropriate for defendants.

### ii.  Prosecutorial Discretion

Cox Bail Bonds also contends that the "stigma" was the criminal charges commenced against Gerald and James Cox, and that the "plus" was the revocation of its license to issue bonds.[10] (Doc. 1 at ¶¶ 40, 44).

_____

[9]This presumes, however, that an allegedly unlawful arrest and pursuit of criminal charges can serve as the basis for a § 1983 claim of a due process violation, as opposed to a Fourth Amendment violation. <u>Piland v. Esposito</u>, Civil No. 3:09CV825(AWT), 2010 WL 918306, at *2 (D. Conn. Mar. 11, 2010) ("'[I]t is the Fourth Amendment, and not due process, under which' a § 1983 claim based on the institution of criminal charges without probable cause must be judged.") (quoting <u>Albright v. Oliver</u>, 510 U.S. 266, 271 (1994)).  Because, as discussed below, Count I fails regardless, the court need not resolve this issue.

[10]To the extent Cox Bail Bonds argues that the search warrant and defendants' reports also caused the revocation of its license, the record
(continued...)

The parties agree that Duepner "had the final decision, and not Defendants Delia and Fanning, as to which charge(s), if any, would be brought against Gerald and James Cox based on the evidence presented." (Doc. 44 at ¶ 133.)  "§ 1983 liability requires personal involvement in or direct responsibility for actions resulting in [the constitutional] violation." <u>Carter v. Hassell</u>, 316 Fed. App'x 525, 525 (8th Cir. 2008) (per curiam).  Duepner is not a party to this action.  Because the charges were brought at the sole direction of Duepner, defendants cannot be liable for the commencement of the criminal actions.[11]  <u>Flowers v. City of Minneapolis</u>, Civil No. 05-2484 (JRT/FLN), 2007 WL 2893349, at *9 (D. Minn. Sept. 28, 2007) ("Officers cannot be held liable for the initiation of . . . criminal proceedings where the chain of causation between a police officer's unlawful arrest . . . and a subsequent prosecution is broken by the intervening exercise of independent judgment.") (citation and alterations omitted);[12] <u>cf. Lawrence v. City of St. Paul</u>, 740 F. Supp. 2d 1026, 1051 (D. Minn. 2010) (malicious prosecution claim against officers failed where the prosecutor had independent discretion whether

---

[10](...continued)
does not support this assertion.  The only evidence upon which plaintiffs rely is an e-mail from Duepner to Lt. Delia, in which Dupener said,

> I think we should give Favazza a heads up in the AM.  I will call him when I get in tomorrow.  I am trying to get in touch with the appropriate authority in our Circuit Court to see if [plaintiffs] bonding privileges should be suspended.

(Doc. 37-33 at 16.)  Because the e-mail indicates that Duepner, not Lt. Delia, intended to contact the Circuit Court Clerk regarding plaintiffs' license, this e-mail does not support plaintiffs' assertion.

[11]Moreover, courts have held that "a stigma-plus action cannot lie against a defendant who has no ability to impose a plus, or to provide process to the plaintiff." <u>Orr v. Wisner</u>, Civil Action No. 3:08-CV-953 (JCH), 2010 WL 2667918, at *8 (D. Conn. June 29, 2010) (discussing <u>Velez v. Levy</u>, 401 F.3d 75, 89 n.12 (2d Cir. 2005)); <u>accord</u> <u>Anemone v. Metro. Transp. Auth.</u>, 410 F. Supp. 2d 255, 270 (S.D.N.Y. 2006).

[12]Also, plaintiffs have not argued that defendants gave misleading information to Duepner or that defendants pressured Dupener into bringing the charges.  <u>See</u> <u>Flowers</u>, 2007 WL 2893349, at *9 (judgment is not independent if the officers misled or pressured the prosecutor).

to bring criminal charges).  Moreover, Duepner independently determined that probable cause existed to charge Gerald and James Cox, and brought charges based on this belief.  (Doc. 33-10, Dupener aff. at ¶ 19.) Duepner's actions "effectively insulated" defendants from § 1983 liability regarding the pursuit of the criminal charges.  Sarmiento v. King Cnty., 77 Fed. App'x 932, 934 (9th Cir. 2003) (unpublished); see also Rhodes v. Smithers, 939 F. Supp. 1256, 1274 (S.D. W. Va. 1995) ("[I]t is . . . well established that where an officer presents all relevant probable cause evidence to an intermediary, such as a prosecutor, . . . the intermediary's independent decision to seek a warrant . . . breaks the causal chain and insulates the officer from a [§] 1983 claim based on lack of probable cause . . . .")

Thus, Count I fails because defendants did not commence the charges.

### iii.  Probable Cause

Moreover, assuming that the license was constitutionally protected,[13] and that the revocation of the license was caused by defendants,[14] Count I fails because the criminal charges brought against Gerald and James Cox

---

[13]Defendants contend the revocation cannot satisfy the "plus" requirement because plaintiffs did not have a liberty interest in the license.  Courts analyzing state laws have found protected property interests where no discretion existed regarding issuing the license or accepting the bonds.  Compare Baldwin v. Daniels, 250 F.3d 943, 946-47 (5th Cir. 2001) (not constitutionally protected under Mississippi law) with Vera v. Tue, 73 F.3d 604, 607 (5th Cir. 1996) (constitutionally protected under Texas Law).  See also Olibas v. Gomez, 481 F. Supp. 2d 721, 727-28 (W.D. Tex. 2006) (recognizing this distinction).  See generally Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005) ("[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion.").  Under Missouri law, the Circuit Court Clerk retains no discretion regarding the issuance of a bond license.  See Mo. Sup. Ct. R. 33.20 ("Any corporation . . . *shall* be qualified to act as a surety upon any bail bond . . . upon presenting evidence satisfactory to the court of its solvency.") (emphasis added).  Thus, the court presumes that the license was constitutionally protected.

[14]Plaintiffs' asserted theory is that defendants' pursuit of criminal charges caused the Circuit Court Clerk to revoke the license.  Assuming "perfect parity" is not required, Count I would not fail on the ground that the "stigma" and the "plus" were caused by different actors.  See Velez, 401 F.3d at 89.

were supported by probable cause. A § 1983 defamation claim based on the pursuit of criminal charges is defeated where probable cause supported the criminal charges. <u>Hart v. Parks</u>, 450 F.3d 1059, 1070 (9th Cir. 2006); <u>Collins v. Doyle</u>, 209 F.3d 719, 2000 WL 284021, at *9 (5th Cir. Feb. 9, 2000) (unpublished table opinion); see <u>Roche v. John Hancock Mut. Life Ins. Co.</u>, 81 F.3d 249, 254 (1st Cir. 1996). Whether probable cause existed is a question of law. <u>Fisher v. Wal-Mart Stores, Inc.</u>, 619 F.3d 811, 816 (8th Cir. 2010). In determining whether probable cause existed, the court should consider the totality of the circumstances in light of the information known at the time of the decision. <u>Id.</u>

The facts and statements gathered during the detectives' investigation gave probable cause to arrest James Cox on September 18, 2008, and probable cause to commence criminal proceedings against Gerald and James Cox on November 26, 2008.

<u>Probable Cause to Arrest on September 18, 2008</u>

Through an interview with Lance Peabody, Officer Zambruski and Det. Fanning learned of Peabody's dealings with Pinion, Gerald and James Cox, and Cox Bail Bonds, and the events that occurred on the night of August 17, 2008. Peabody also stated that he was taken against his will from the hotel room, and that he was told by Gerald Cox that he had to pay an additional $5,500.00 or he would go to jail and lose his home. (Doc. 37-16 at 7-9; Doc. 37-22.) The detectives had no reason to doubt the veracity of Peabody's statements, and as such they were permitted to rely upon them in their investigation. <u>See Clay v. Conlee</u>, 815 F.2d 1164, 1168 (8th Cir. 1987) ("[L]aw enforcement officers are entitled to rely on information supplied by the victim of a crime, absent some indication that the information is not reasonably trustworthy or reliable."). Peabody's statements were confirmed when Officer Zambruski and Lt. Delia interviewed and obtained a written statement from Leah Pinion. (Doc. 37-16 at 10-11; Doc. 37-21.)

The detectives gained further reason to suspect plaintiffs of wrongdoing after an interview with Arlene Taylor. Taylor confirmed that Gerald Cox threatened to take Peabody's home and to send Peabody to jail. Taylor also said that she paid plaintiffs the $5,500.00 owed by Peabody,

but that she was not given an itemized receipt when she made the payment. (Doc. 37-16 at 13, 14; Doc. 33-7, Zambruski Aff. at ¶ 27; Doc. 37-25.)

Officer Zambruski and Lt. Delia used subpoenas to obtain the check written by Taylor and given to plaintiffs. The check confirmed the stories of Peabody, Pinion, and Taylor. (Doc. 37-28 at 1-6.)

Under the totality of the circumstances, the statements and evidence gathered through September 18, 2008 provided probable cause to arrest James Cox on September 18, 2008.[15]

### Probable Cause to Bring Criminal Charges on November 18, 2008

Following their investigation leading to the arrest of James Cox on September 18, 2008, the officers gathered additional information that supported criminal charges against Gerald and James Cox.

In his statement to the police, Kevin Grillion stated that upon restraining Peabody and Pinion, Morris Davis called the Cox Bail Bonds office and spoke with someone who Grillion believed to be Gerald Cox. Grillion also stated that he and the other agents were instructed to bring both Peabody and Pinion to the Cox Bail Bonds office, because Gerald Cox wanted to talk to them. (Doc. 37-18 at 6; Doc. 37-28 at 13.)

In his statement to the police, James Cox stated that he prepared an invoice for Peabody for $5,050.00, which included all fees supposedly owed, and which was later paid by Arlene Taylor. This amount conflicted with the actual amount paid by Taylor. (Doc. 37-19 at 4.)

On September 18, 2008, Officer Zambruski and Officer Emerson interviewed Morris Davis. During the interview, Davis said that he had told James Cox that he had Lance Peabody in his custody, and had taken photographs of Lance Peabody in custody and sent them to James Cox. When asked, Davis affirmed that James Cox knew that Davis had taken Lance

---

[15]In his affidavit, James Cox avers that he told defendants that he was entitled to collect the $5,500.00 from Peabody, and that he did not learn that Peabody had been seized until the morning after the seizure. (Doc. 44-1, Cox aff. at ¶¶ 19-23.) Assuming these statements were made before the arrest, they would not have destroyed the probable cause to arrest. See Askew v. City of Chicago, 440 F.4d 894, 895 (7th Cir. 2006) ("Police need not conduct an investigation but may arrest and let prosecutors and courts determine who is telling the truth.").

Peabody into custody and was taking him to the Cox Bail Bonds office. Davis also said that the only person Peabody would have owed money to would have been him (Davis), and that Cox Bail Bonds did not have a right to charge Peabody the extra expenses. (Doc. 37-28 at 25-28; Doc. 36.)[16] Cf. Sheets v. Butera, 389 F.3d 772, 777-78 (8th Cir. 2004) (accomplice's statements gave police probable cause to arrest).

Officer Emerson told Det. Fanning that Davis had admitted taking photographs of Pinion and Peabody at the time of the August 17, 2008 capture, and had admitted sending the photographs to James Cox with his cell phone. Assistant prosecutor Gentry Smith asked the detectives to further investigate the matter. (Doc. 37-32 at 35.)

Although the criminal charges were ultimately dropped, this does not mean there was not probable cause supporting the criminal charges at the time they were brought. Kurtz v. City of Shrewsbury, 245 F.3d 753, 757 (8th Cir. 2001) (police officer not liable for false arrest simply because criminal charges are ultimately dismissed). The parties stipulate that in return for dropping the criminal charges against Gerald and James Cox, Cox Bail Bonds returned to Taylor the $5,500.00 that she previously paid. This agreement appears to contradict, at least to some degree, plaintiffs' allegation that the pursuit of criminal charges was based on "knowingly false" allegations; rather, the agreement is consistent with allegations that plaintiffs unlawfully obtained the $5,500.00. Cf. Gautreaux v. Sanders, 395 Fed. App'x 311, 312 (8th Cir. 2010) (per curiam) (guilty plea waives § 1983 malicious prosecution claim as to those charges).

Under the totality of the circumstances, probable cause existed to bring criminal charges against Gerald and James Cox on November 18, 2008.

In sum, defendants cannot be held liable because Duepner decided to file criminal charges and because probable cause supported those charges. Therefore, summary judgment is appropriate as to Count I.

---

[16]Doc. 36 is a compact disk of the September 18, 2008 interview with Morris Davis conducted at the Maryland Heights Police Department. The relevant segments include 19:00-23:30, 51:30-53:00, 1:16:00-1:23:00.

**5. Count III: Unreasonable and Unlawful Seizure**

In Count III, James Cox alleges defendants did not have probable cause to arrest him on September 16, 2008. He notes that, although the search of the Cox Bail Bonds office that day was pursuant to a search warrant, no arrest warrant was secured. He argues that defendants arrested him despite lacking probable cause.

A warrantless arrest may be actionable under § 1983 if not supported by probable cause. Kiser v. City of Huron, 219 F.3d 814, 815 (8th Cir. 2000). If probable cause to arrest existed, however, then § 1983 does not impose liability for a Fourth Amendment violation on the arresting officers. Anderson v. Cass Cnty., 367 F.3d 741, 745 (8th Cir. 2004). "In determining whether probable cause exists to make a warrantless arrest, a court will consider whether, based on the totality of the circumstances, the facts would justify a reasonably cautious police officer's belief that the individual arrested has committed or was committing an offense." Marksmeier v. Davie, 622 F.3d 896, 900 (8th Cir. 2010) (citation omitted).

As discussed in Count I above, at the time of the September 18, 2008 arrest, defendants had probable cause to arrest James Cox for felony stealing.[17] See Kiser, 219 F.3d at 815-16 (affirming the police officer was not liable under § 1983 where he arrested the plaintiff solely because of the victim's allegations). Thus, defendants were permitted to arrest James Cox, and were not obligated to obtain an arrest warrant or conduct an additional investigation. Id. at 815.

Therefore, because defendants had probable cause to arrest James Cox on September 16, 2008,[18] Count III fails.

---

[17]Although not set forth by the parties, it appears as though James Cox was arrested on September 18, 2008 only for the charge of felony stealing. (Doc. 37-28 at 19, 30.)

[18]In their memorandum, defendants Delia and Fanning also raise the defense of qualified immunity. See, e.g., Chambers v. Pennycook, 641 F.3d 898, 904 (8th Cir. 2011) (discussing qualified immunity). Although it follows that because probable cause existed to arrest James Cox on September 16, 2008, "arguable probable cause" also existed, the court
(continued...)

### 6. Count IV: False Imprisonment

In Count IV, James Cox raises a false imprisonment claim arising out of his September 16, 2008 arrest. (Doc. 1 at ¶¶ 57-62.)

Assuming false imprisonment is cognizable under § 1983,[19] to state such a claim, "a plaintiff must demonstrate the elements of a common law claim and show that his Fourth Amendment right to be free from unreasonable search and seizure has been violated." Hinton v. Franck, 242 F.3d 388, 2000 WL 1846195, at *4 (10th Cir. Dec. 18, 2000) (unpublished table opinion). Under Missouri law, a plaintiff must satisfy two elements to succeed on a claim of false imprisonment: "(1) the detention or restraint of one against his will, and (2) the unlawfulness of such detention or restraint." Gibbs v. Blockbuster, Inc., 318 S.W.3d 157, 169 (Mo. Ct. App. 2010).

Probable cause is a complete defense to a false imprisonment claim, whether brought under § 1983 or under Missouri law. Hinton, 2000 WL 1846195, at *3 (§ 1983); Fisher, 619 F.3d at 819-20 (Missouri law). As discussed above in Count III, defendants had probable cause to arrest James Cox on September 18, 2008.

Therefore, summary judgment is appropriate as to Count IV.

### 7. Count V: Malicious Prosecution

In Count V, James Cox alleges defendants instituted criminal proceedings against him despite knowing that the charges were based on inaccurate, incomplete, and false evidence, and that probable cause did not exist to support the charges.

---

[18](...continued) need not resolve this claim on this ground.

[19]Support exists within this circuit for finding that false imprisonment is not actionable under § 1983. See King v. Beavers, 148 F.3d 1031, 1034 (8th Cir.), cert. denied 525 U.S. 1002 (1998); Meadors v. Schneider, No. 4:10 CV 582 MLM, 2010 WL 1838976, at *2 (E.D. Mo. May 6, 2010); Dunkin v. Morales, No. 1:11CV00011JMM, 2011 WL 719016, at *2 (E.D. Ark. Feb. 22, 2011); Egziabher v. Duell, Civil No. 10-5259, 2011 WL 320084, at *1 (W.D. Ark. Jan. 28, 2011).

The Eighth Circuit has "uniformly held that malicious prosecution by itself is not punishable under § 1983 because it does not allege a constitutional injury." <u>Kurtz</u>, 245 F.3d at 758; <u>accord</u> <u>Pace v. City of Des Moines</u>, 201 F.3d 1050, 1055 (8th Cir. 2000).[20]  Thus, plaintiffs cannot sustain a malicious prosecution claim under § 1983.

Moreover, a malicious prosecution claim would be improper against defendants because, as the parties stipulate, prosecutor Duepner retained full discretion as to whether charges would be brought.  <u>Skousen v. Brighton High Sch.</u>, 305 F.3d 520, 529 (6th Cir. 2002) (holding that the defendant-officer "[could not] be held liable for malicious prosecution when he did not make the decision to prosecute [the plaintiff].").  Furthermore, as discussed above, probable cause existed to commence criminal proceedings against plaintiffs.

Therefore, summary judgment is appropriate as to Count V.

### 8.  Count VII: Conspiracy to Violate Civil Rights

In Count VII, plaintiffs allege defendants conspired to violate their civil rights in that they brought criminal charges against Gerald and James Cox, despite knowing that such charges were not supported by probable cause.   Plaintiffs allege that such conduct caused the imprisonment of Gerald and James Cox and the revocation of Cox Bail Bonds' permits and licenses.  (Doc. 1 at ¶¶ 78-81.)

"To prove a [§] 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." <u>White v. McKinley</u>, 519 F.3d 806, 814 (8th Cir. 2008).

---

[20]The Supreme Court has not addressed whether a claim of malicious prosecution is cognizable under § 1983.  <u>Wallace v. Kato</u>, 549 U.S. 384, 390 n.2 (2007).   Although other circuits have held that malicious prosecution can violate the Fourth Amendment, and thus be actionable under § 1983, the Eighth Circuit has left no doubt that it does not recognize such a claim.  <u>Compare</u> <u>Kurtz v. City of Shrewsbury</u>, 245 F.3d 752, 758 (8th Cir. 2001) <u>with</u> <u>Pitt v. District of Columbia</u>, 491 F.3d 494, 510-11 (D.C. Cir. 2007).

Plaintiffs contend that Chief O'Connor, Lt. Delia, and Det. Fanning conspired to deprive them of their constitutional rights. Plaintiffs, however, do not proffer evidence of facts supporting their assertion. "Speculation and conjecture are not enough to prove a conspiracy exists." Mettler v. Whitledge, 165 F.3d 1197, 1206 (8th Cir. 1999). Moreover, because plaintiffs have not shown that defendants violated their constitutional rights, "there can be no civil rights conspiracy to deprive that right." Young v. Cnty. of Fulton, 160 F.3d 899, 904 (2d Cir. 1998).

Therefore, summary judgment is appropriate as to Count VII.

## B. Claims Arising Under State Law

Because defendants are entitled to summary judgment as to plaintiffs' federal law claims, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims, to the extent they are not resolved through the resolution of plaintiffs' federal law claims. 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction."); Thomas v. Dickel, 213 F.3d 1023, 1026 (8th Cir. 2000).

Therefore, Counts II, VI, VIII, IX, X, XI, and XII are dismissed without prejudice.

## VIII. CONCLUSION

For the reasons discussed above, the motion of defendants the City of Maryland Heights, Tim O'Connor, Joe Delia, and Sean Fanning to strike the affidavit of James Cox (Doc. 52) is sustained in part, and otherwise denied; the motion of defendants for summary judgment (Doc. 32) is sustained as to Counts I, III, IV, V, VII;  and Counts II, VI, VIII, IX, X, XI, and XII of plaintiffs' complaint are dismissed without prejudice.

An appropriate Judgment Order is issued herewith.

      /S/   David D. Noce      
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 13, 2011.

- 26 -